Good morning. I'm Jim Brandon. I represent Mr. Hayes on appeal. I'm going to start with the sufficiency claim. It's been a while since I raised one of those at oral argument, but I'm sure the Court's aware that Mr. Hayes was not found actually in possession of a firearm. The firearm at issue here is a shotgun that was found in the apartment where he was when the police executed a search warrant. Mr. Hayes was found in the living area of the apartment, in the nexus between the dining room and the living room. As you move further into the apartment, there is a hallway near the kitchen. A woman was found there carrying a big kitchen knife. That was Simone is her last name. And then a small boy was in the very back bedroom. There is a second bedroom that was before that one as the police were moving through it and as one would move through the apartment. And inside a closet in that bedroom was the shotgun. The only other things that the police could remember that were in that closet was a fleece and a sweatshirt. And this closet was off a child's bedroom, correct? I think there were just two bedrooms. So this closet was inside the second bedroom. The child was found in the other bedroom. But I don't know if the bedrooms were designated child's bedroom or adult bedroom. The jury was charged, as they should have been, I believe, that because there was they were charged with actual possession, but like I said, there was no actual possession. And then they were charged that they could find Mr. Hayes guilty if he had the power and the intention to exercise control over the gun. Mr. Brand, let me just ask you to go back before you get to the instructions. There were certain facts that you didn't point out there. I think I'm about to get to those. Right. Because I think the government He was viewed there. He was surveilled there on five different occasions, you know, operating a grill, inviting people in and out. That was one piece, right? When there was a discharge of the weapon, he said, who's shot a shot in my in my house? He gave it as his booking address on two occasions. So, you know, obviously construing the evidence most favorably to the government, the jury could certainly have found that he was residing there, right? I think that the jury could have, although there is evidence contrary to him living there. First of all, the mail didn't, wasn't an address that was the place where the, where the apartment is. His name was on a different, at a different address. Correct. And then there was a benefits card. And neither of those were found in the bedroom or in the closet. They were found in the living room. You're right. He said, who shot a shot in my house? The benefits card had his address, the woman address on it, though, right? Or am I mistaken about that? No, I think that's a misstatement. I think that the mail, the piece of mail had an address that was different from this residence. The benefits card, I don't remember having an address. Some piece of mail that had that address on it, the walnut address, no? There were two pieces of mail, right? One that did and one that didn't? One piece of mail and one benefits card. And I don't believe the benefits card had an address on it. Okay. I could be mistaken, but I don't think that's so. So the only piece of mail was, like I say, at a different address. But you're right. He said my house. When he got arrested, he gave that address as his booking address or the place of his residence. So I would say to you that, yes, I think that Mr. Hayes, at the very least, had permission to be in that apartment regularly. And I think that one could argue that he had the power to exercise control over the gun, but there's nothing in this record that shows that he had any intention to do so. So there's nothing that directly ties him to the gun. The fleece, the sweatshirt. Well, the jury was charged that he has to have the power and the intention to exercise control over it. I don't see — there's nothing in this record, which is why I'm arguing sufficiency. Well, he was there — It shows he had any intention. He was there so much. I mean, he grilled there. I mean, that's, you know, kind of a speaks of permanency. They went in because — Well, I don't just grill anywhere. I grill where I regularly reside. That's the kind of thing. There's a connection, isn't there? Well, but at odds — If he's there all the time, if he refers to it as his house, can't — isn't it a reasonable inference that he knows what's there? It's a gun. At odds. It's a little boy, certainly. It wasn't the little boy's gun. Could have been Simone. Yeah. Who's carrying a knife around with her. It could have been both their guns. It could have been. But the government has to prove it, Judge. It's not — I mean, we could make suppositions all day. But I'm asking you, is it rational for a jury to have concluded that — I think it was irrational for the jury to conclude on this evidence that there's proof of his intent to exercise control over that gun. But you're not saying that there was sufficient evidence to prove that he lived there. I think I have to concede that on some level. But not sufficient evidence to prove that he possessed the gun as opposed to the — someone else who lived there. Correct. But I will also say with regard to whether he lived there, there was nothing of his possessions other than the letter and the benefits card that — Didn't the parties open by saying that he — that the house — the house was occupied by his girlfriend and his children? I think both parties in opening statements, or am I misremembering them? I don't recall that either. I remember an opening where, after the defense attorney introduced himself, he said, mere presence, mere proximity, mere association, that's what this case is about. So that bleeds into my fair trial points. That's point two. I think this Court in Vasquez has sort of already ruled on this issue, that when there's enough factual basis in the record, courts are better advised to give the mere presence charge and should do that. And that was not done here. I understand that, absolutely. But what is — what is missing from the charge? How did this charge lead the jury, allow the jury to do something that they shouldn't have done? Well, this is exactly like Vasquez, because that's the argument that sort of came up in Vasquez. And the point is that it really focuses the jury on mere presence. The defendant was in an apartment. It's true, right? Mere proximity. He was 15 feet away from it. Mere association with Ms. Simone. That alone is not enough. And that was his point. I think that by not giving the charge, it actually undermined the whole defense, what the opening was and what the closing was. The instruction in Vasquez in here was the same on the other points, which is that you have to know the gun is there. You have to — you just went through it. You have to exercise control over it, be able to exercise control over it, and have the intent. So mere presence is — under that instruction is not enough. You have to know the gun is there, and you have to have the ability and the intent to exercise control over it. So how could a jury be misled simply because that word of mere presence wasn't in there, given all the other requirements that they heard? I think it easily could be misled, because what the defense attorney was trying to get them to focus on really was mere presence. The language that the Court uses here, had the power and intention to exercise control over it, is something of a nuanced legalese concept. When you boil it down for a jury and you tell them it's just not enough that he was in the apartment, I think juries get that. That speaks to actually the real-life circumstances of what the defendant wanted to present to the jury. And I think you — the Court has already ruled that in Vasquez, that it's preferable to give the mere presence charge, because it speaks to the jury. But now we'd be saying it's error. We're not saying it's preferable. If we were to come out in your favor, we'd be saying it's an error. You have to give it. But it would be error in this case because it was so prejudicial. So you could save yourself on the prejudicial error aspect of it. Where they found it not prejudicial in Vasquez, they would find it prejudicial here, meaning you all, principally because that was the main and repeated thrust of the defense throughout. I think that the — the redirect examination of the detective, which is my third point, also dovetails with that argument. The — I'm going to continue unless you tell me to sit down. Okay. To hear this point. I'll be quick with regard to this. With regard to the third point in the brief, there was a pretrial ruling that precluded the government from introducing evidence that there had been confidential informant buys. After — on cross-examination of the detective, the defense attorney asked the — the detective, excuse me, whether the amount of marijuana found in the apartment was consistent with personal use and whether Simone was charged with any offenses, either with gun possession or with drug possession. And the answer to that was no. And the answer to the former question was, yes, it's consistent with personal use. To me, I don't see how that created any false impression about the case. Well, the theory was, is that somehow they picked on him as opposed to Simone and that this was just marijuana for personal use, but they had surveillance of him selling marijuana. But it's not a marijuana case. What's the jury been doing thinking about marijuana? It certainly does — it certainly does explain why he might possess a weapon. Because there's marijuana in there. Because there's violence in drug transactions. So it provides the perfect explanation of why he would want to have possession. But I think this brought us — You said before that there wasn't anything. And unfortunately, this supplies the answer to that. And that was his theory. That's why he asked the question, wasn't it? He asked the question because he wanted to make it into a personal use case. And it wasn't necessarily a personal use case, but the court had cauterized the wound and said, no, we're not going to let you put the drug transaction stuff in. And then the defense counsel went ahead and said, well, you know, this was personal use. I mean, it took away the value of the in limine ruling of the court. Which it was personal use, though. There's no false impression going to — What do you mean it was? They had him surveilled as selling drugs. So to walk in and say that because they found drugs in the place it was for personal use kind of opens the door for an explanation as to why it wasn't, doesn't it? I have — I have a — I have a — I have four packages of cocaine in my desk. And they come in and they arrest me. And I say, well, that's really for personal use. They say, well, we have you on tape selling it to a number of people. That kind of undercuts my personal use, doesn't it? Doesn't it? It does. But I — Okay. First of all — So doesn't — doesn't — doesn't the surveillance with regard to marijuana transactions undercut the defense that he was trying to use of personal use? Yes, I think that it does. Okay. But that was ultimately not a defense that was being proffered before the jury because there were no charges about marijuana distribution or sale. Why answer that? Because he wanted to minimize the fact that it probably looked bad that there was some marijuana in the apartment. I don't think that should have come in in the first place. Why don't you think the figure is Simone? You wanted to say that there was something about Simone — Which he's entitled to do. — a deal. Why can't he do that? Okay. Why can't he say it could have been Simone's gun, it could have been her marijuana? Okay. Thank you. Excuse me. And I have a Rahief claim. I don't know how to say that name. You can address that on — on rebuttal. Good morning. May it please the Court. Catherine Gregory, Assistant U.S. Attorney representing the government in this matter. I'm just starting off where my — my esteemed counsel left off with the redirect evidence. I think it's important to note in the transcript you can see that defense counsel asked the detective six or seven questions about Ms. Simone. Ms. Simone wasn't arrested for child endangerment. Ms. Simone wasn't arrested for marijuana. Ms. Simone — you can see on and on and on creating this impression that Ms. Simone had just as much opportunity to have this gun and this marijuana and that the police apparently chose someone at random to — to assign the gun to. And that simply wasn't the case. And the weighing of prejudice versus relevance can change under Rule 403 as this court has held, I think in a different Vasquez case, as — as testimony proceeds. And the person in the best position to make that determination would be the district court who can see the witness testifying and hear the testimony and see the effect on the jurors and then make that determination. And that's what — exactly what happened here. With respect to the jury instruction itself, the — the district court noted, I think, in the notes — Can I just ask — Yes. So the defense opened the door with this line of questioning. But then the — the government walked through the door. So now the marijuana transactions come in. But then a very strong assertion of — of a relationship between the gun and the — Yes. I mean, was that appropriate on this record? Well, that was one of the — that was one interpretation that you could make, that — that that amount was consistent with personal use. Another interpretation was what the government offered, is that that's a small amount, but there were — he was still selling. And once that door was open, the government was entitled to then use the evidence that was in the record to make the argument that they made in the summation, which was, why do you have a shotgun? Because you're selling drugs out of the house. Now, had — had defense not opened the door, the government wouldn't have made that argument in summation. But the evidence was in the record, and as the evidence was there, the government was entitled to submit that to the jury and allow them to draw that inference. Didn't the district court say it was a close call to begin with, too? I think in the initial ruling, the district court said this is a close call, but I'm not going to allow it, right? I believe that's correct, yes. And then the — here the government did the appropriate thing. I believe before they even did the redirect, they asked for a look, and they said, look, things have changed. Can we — can we at least bring this in to show that there's not this false impression? With respect to the instruction, the district court noted that in the notes to the requested instruction, the mere proximity, I think there's a — there's a note that there's a risk of confusion for juries. And the district court cited that when he denied the instruction. He said, it says right there in the notes that there's a risk of confusion, and that's what I'm concerned about. And the Vasquez case cited by the appellant involves, I believe, a defendant who was just in a high-crime area and was found in mere proximity. This was a shotgun that was in a closet with a male jacket, a male flannel shirt, described by defense counsel as being male clothing, where there was an abundance of evidence that the house was his. It's simply different circumstances. And even in Vasquez, it was — it was noted that it might be best practice to include the mere proximity, but it still upheld the instruction that was given in this case as well. With regard to the — I mean, that it wasn't his gun, that it belonged to another occupant of the home, in this case, his girlfriend. And he absolutely made that argument. And wouldn't this instruction have clarified that this was his defense, that he was merely present in an apartment? He lived with someone who happened to own a gun. Well, he — a defendant is entitled to jury instructions that reflect his theory. And that theory was reflected. The district court did give an instruction that it can't be the product of a mistake or accident. If the jury had believed that he was just there, that it was just an accident, that he was merely present, they wouldn't have found him guilty. I guess I'm not quite seeing how this instruction would have been confusing. It doesn't mean that it necessarily had to be given, but I'm — on the facts of this case, it seems like it might have been a helpful instruction. So what am I missing? It may have been helpful. It may not have been, but the district court's determination here allowed for the reflection of the defense's theory and avoided what the notes noted. And I don't recall the exact phrasing of the notes at this very moment to that instruction, but the notes did say that there was a risk of confusion. I wish I could do more than refer the Court to that. The government objected to the giving of this instruction? I'm sorry? Did the government object to the instruction? Yes. Yes, the government did. And again, the defendant is not entitled to have an instruction that parrots his opening and summation. And I'll note that he did use that same phrase even after he knew that he wasn't going to give the instruction. He used that same mere proximity, mere presence. Again, it was his choice to do that after he knew that the instruction wasn't going to come in. And I would just like to address the Rahaif question. There is a bit of a disconnect here between the Rahaif decision itself and the Rahaif was a jury misinstruction case. It was not a jurisdictional issue there. And, of course, it involved immigration and not a felony status. Here the appellant is saying that the indictment is somehow deficient, even though the statute hasn't changed since Rahaif. So this Court consistently upholds indictments that do little more than track the language of the statute. And that's exactly what the indictment does. It tracks the language of the statute. The language is the same as it was the day before Rahaif was decided, and it is today. You just didn't know what it meant. We just, we grammatically clarified it, Your Honor. So the indictment uses the word knowingly possess. It references the statute. And it just doesn't seem that Rahaif is really applicable to the indictment portion, at least, of the subject matter jurisdiction. And even if there were a flaw in the indictment, you know, this common sense and reason tend to prevail over technicalities. And this Court analyzes indictment defects on a continuum, and that inquiry gets narrower the longer you wait to challenge the defect. So here, just looking at the language of the statute, the indictment, it's clear that there aren't any defects here. If we look at it as a sufficiency, which is mentioned, I think, in passing in the appellant's brief, as it was in Rahaif, it was a jury misinstruction about what they needed to prove. It's a plain error review. There might be error that is plain, but there's simply no way that it substantially affected the substantial rights, because there was a stipulation here. Hayes stipulated that he had been convicted of a prior felony. And if the instruction had been given, I just don't see how they could have argued how it could have changed the outcome. You could stipulate that you had the felony. If you knew they also approved knowledge, you may not have entered that stipulation would be the argument. I think factually, obviously, he had four felony convictions, so I think that's a different issue. But just because you enter a stipulation that you were a felon doesn't mean if someone told you, you have to know you were a felon, that you would enter the same stipulation, right? That's true, Your Honor. But I challenge you to find a defense attorney who on these facts would have fought that element and forced the government's hand into bringing in evidence of a criminal sale of a controlled substance and criminal possession and a felony assault, which collectively he did more than 11 years in prison, rather than do a stipulation in this case on these facts. I just, I don't think there's a competent defense attorney who would have allowed the government to do that by foregoing a stipulation. The other circuits that have considered these kinds of facts where there was a stipulation have noted that the stipulation in conjunction with a lengthy prison sentence for those defendants would be sufficient and that it would. And you're saying that that's the right approach. I mean, we have not issued an opinion. Maybe another panel before ours will issue an opinion before we do. But your theory is this is instructional error and that in deciding whether there was, it's plain error, you can go outside the record and look at the fact that the defendant had spent a substantial amount of time in prison in saying that it wasn't plain error because it wouldn't have made any difference, which does seem to be what these other circuits have done. I don't think that you need to go outside the record, Your Honor. I'm just pointing out that when the Eighth and Ninth Circuits happened. Aren't you going outside the record? If you look at his conviction history and his imprisonment? It's our position that just looking at the stipulation where he stipulates that, and defense counsel said in his summation, we know that there was, you know, that he falls into this category of, I don't know if he, I don't think he used the word felony, but he said we know that this is the case. There was a stipulation. It's our position you don't need to go beyond the stipulation because had there been an instruction, there's. Kennedy, was it your view that the stipulation inherently has within it that he knew that he was a felon? You could certainly draw the reasonable inference that he knew he was a felon, just as you can draw a reasonable inference from the evidence in other ways. So just as you can draw an inference that he lived in the house and that that was his shotgun based on the circumstantial evidence and that he possessed it, you can draw that same inference based on the stipulation here. Just on this issue of in the record or outside the record, aren't all four felonies in the PSR, which is part of the record before the court, right? In other words, the fact that he had four prior felonies and the amount of time he served for each was all part of the sentencing record, right? Yes, and the government was absolutely prepared to prove that. And here I think it's important to note under plain error that reversal is only warranted where he can show a reasonable probability that but for the error, the outcome would have been different. And I just don't think that with this stipulation and with the record as it was, that you can say that there is a reasonable probability that the outcome would have been different. So the idea is it doesn't have to be in the trial record before the jury. We can do plain error review and look at the PSR and make this judgment. It's our position that the stipulation is sufficient for a rational trial fact to make that inference. Thank you. I guess just briefly with regard to the new Supreme Court case, and I think it's noted in the Benamor decision, which is the Ninth Circuit case, it used to be that there were three elements to a 922G1 charge. The defendant was a felon. The defendant knowingly possessed a firearm or ammunition. And the firearm or ammunition was in or affecting interstate commerce. Now added to that is that the defendant knew he was a felon. So this indictment does not, in fact, track the elements of the offense. They're missing one. They're missing that the defendant knew he was a felon. It doesn't track the elements. It tracks the exact language of the statute, right? But it's supposed to give all the elements. It has the word knowingly in it. Now it's been interpreted to mean two forms of knowing. Knowing you have the gun and knowing you have the felony. But it tracks the language of the statute verbatim, I think, almost. Let me look at. So he was charged by indictment on or about August 15, 2014, having previously been convicted of a felony on X date and Y date. He unlawfully did knowingly possess. So the problem is what it needs to say there is having previously been convicted on those dates and knowing that he was so convicted. The question you were asked. The question you were asked, does it track the statute? And it does. The Supreme Court read the knowingly up into the status element, which Justice Alito pointed out quite well. The statute hasn't been amended to rearrange it. The statute reads the way it reads. We can understand that. Well, I would disagree. Of course you can disagree. Because everybody's been misreading it. You're welcome to disagree. That's your job. Right. But frankly, I disagree with you. My job, too. Do you have any questions for me? None. Okay. Thank you very much. Thank you both. We'll take the matter under advisement.